# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
DANA-FARBER CANCER INSTITUTE,           )
                                        )
           Plaintiff,                   )
                                        )
    v.                                  )        Civil Action No. 14-1269 (RBW)
                                        )
SYLVIA M. BURWELL,                      )
Secretary, United States Department of  )
Health and Human Services,              )
                                        )
           Defendant.                   )
_____)

## MEMORANDUM OPINION

The plaintiff, Dana-Farber Cancer Institute, a hospital located in the Commonwealth of

Massachusetts, seeks judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701–706 (2012), of a decision denying reimbursement to the plaintiff of the gross amount of a

tax imposed by Massachusetts, which the defendant, Sylvia M. Burwell, in her capacity as

Secretary of the Department of Health and Human Services ("Secretary"), offset by the amount

of Medicaid reimbursements the plaintiff received from Massachusetts.  Complaint for Review

of Agency Action ("Compl.") ¶¶ 69–71.  Two motions are currently pending before the Court:

(1) Dana-Farber Cancer Institute's Motion for Summary Judgment ("Pl.'s Mot."), and (2) the

Defendant's Cross-Motion for Summary Judgment ("Def.'s Mot.").  Upon careful consideration

of the parties' submissions and the administrative record in this case, the Court concludes that it

must grant in part and deny in part the plaintiff's motion, deny the Secretary's motion, and

vacate the Secretary's final decision.[1]

---

[1]  In addition to the documents previously referenced, the Court considered the following submissions in reaching its
decision:  (1) the defendant's Answer ("Answer"); (2) the Memorandum of Points and Authorities in Support of

(continued . . . )

## I.   BACKGROUND

### A.   Statutory and Regulatory Framework

#### 1.   The Medicare Program

"The Medicare program[, 42 U.S.C. §§ 1395–1395hhh,] . . . provides federally funded health insurance for the elderly and disabled." Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1226–27 (D.C. Cir. 1994). "Under an extremely 'complex statutory and regulatory regime,' health care providers are reimbursed for certain costs that they incur in treating Medicare beneficiaries." Id. at 1227 (quoting Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 405 (1993)). The Centers for Medicare and Medicaid Services ("CMS") "is the operating component of the [Department of Health and Human Services ("Department")] charged with administering the Medicare program." Cove Assocs. Joint Venture v. Sebelius, 848 F. Supp. 2d 13, 16 (D.D.C. 2012). "The [Department]'s payment and audit functions under the Medicare program are contracted out to insurance companies, known as [f]iscal [i]ntermediaries . . . ." Cmty. Care Found. v. Thompson, 412 F. Supp. 2d 18, 20 (D.D.C. 2006). "At the close of the fiscal year, a provider submits to the fiscal intermediary a report of costs it has incurred during that year." Id.; see also 42 C.F.R. § 413.20. The fiscal intermediary "reviews the report . . . [,] determines the total Medicare reimbursement due to the provider[,] . . . [and] publishes the amount in a notice of program reimbursement . . . ." Thompson, 412 F. Supp. 2d at 20; see also 42 C.F.R. § 405.1803. "If a hospital disputes the intermediary's calculations, it may then appeal the determination to the . . . [Department's Provider Reimbursement Review] Board [(the

---

( . . . continued)
Plaintiff Dana-Farber Cancer Institute's Motion for Summary Judgment ("Pl.'s Mem."); (3) the Defendant's Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Mem."); (4) Plaintiff Dana-Farber Cancer Institute's Reply in Support of Motion for Summary Judgment and Opposition to Defendant's Cross-Motion for Summary Judgment ("Pl.'s Reply"); (5) the defendant's Reply in Support of Cross-Motion for Summary Judgment ("Def.'s Reply"); and (6) the Joint Appendix containing portions of the administrative record compiled in this case ("AR").

"Board")] . . . ." Allina Health Sys. v. Sebelius, 982 F. Supp. 2d 1, 5 (D.D.C. 2013) (citing 42

U.S.C. § 1395oo(a), (h)).  "The final decision of the [Board] is subject to judicial review and

may be set aside under the terms of the [APA]." Eagle Healthcare, Inc. v. Sebelius, 969 F. Supp.

2d 38, 41 (D.D.C. 2013) (citing Richey Manor, Inc. v. Schweiker, 684 F.2d 130, 133–34 (D.C.

Cir. 1982)).

The Medicare Act entitles certain providers to "the lesser of . . . the reasonable cost of

[certain] services, . . . or . . . the customary charges with respect to such services[.]"  42 U.S.C.

§ 1395f(b)(1).  The Medicare Act defines "reasonable cost" as "the cost actually incurred,

excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of

needed health services, and shall be determined in accordance with regulations establishing the

method or methods to be used, and the items to be included, in determining such costs . . . ." Id.

§ 1395x(v)(1)(A) (emphasis added).

"The Secretary has promulgated . . . regulations establishing the methods for determining

reasonable cost reimbursement."  Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 92 (1995)

(citation omitted).  And under 42 C.F.R. § 413.98(a), "refunds of previous expense payments are

reductions of the related expense."  The regulations define "refunds" as "amounts paid back or a

credit allowed on account of an overcollection." Id. § 413.98(b)(3).  "The Secretary has [also]

issued a Provider Reimbursement Manual." Catholic Health Initiatives v. Sebelius, 617 F.3d

490, 491 (D.C. Cir. 2010).  "The Manual contains guidelines and policies to implement Medicare

regulations which set forth principles for determining the reasonable cost of provider services,

but it does not have the effect of regulations."  Id. (citation and internal quotation marks

omitted).  Section 2122.1 of the Manual provides that "taxes assessed against the provider, in

accordance with the levying enactments of the several States and lower levels of government and

for which the provider is liable for payment, are allowable costs."  Provider Reimbursement
Manual ("Manual") § 2122.1.

But in 2010, CMS "learned that there [had been] some confusion relating to the
determination of whether a tax is an allowable cost," Medicare Program; Hospital Inpatient
Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital
Prospective Payment System Changes and FY2011 Rates; Provider Agreements and Supplier
Approvals; and Hospital Conditions of Participation for Rehabilitation and Respiratory Care
Services; Medicaid Program: Accreditation for Providers of Inpatient Psychiatric Services, 75
Fed. Reg. 50042, 50362–63 (Aug. 16, 2010) (to be codified throughout 42 C.F.R.), and issued a
"clarification" to the Manual, see id. at 50363 (describing the Department's "clarification" of the
treatment of provider taxes under Medicare reimbursement principles); id. at 50364 ("We will
modify section 2122 of the [Manual] to specifically reference our longstanding reasonable cost
principles.").  CMS expressed concern "that, even if a particular tax may be an allowable cost
that is related to the care of Medicare beneficiaries, providers may not, in fact, 'incur' the entire
amount of these assessed taxes."  Id. at 50363.   CMS provided the following example to
illustrate its concern:

> [I]n accordance with the Medicaid statute and regulations, some States levy tax
> assessments on hospitals.  The assessed taxes may be paid by the hospitals into a
> fund that includes all taxes paid, all Federal matching monies, and any penalties for
> nonpayment.  The State is then authorized to disburse monies from the fund to the
> hospitals.  We believe that these types of subsequent disbursements to providers
> are associated with the assessed taxes and may, in fact, offset some, if not all, of
> the taxes originally paid by the hospitals.

Id.

CMS revised section 2122 of the Manual in December 2011.  AR 000022; see also
Manual § 2122.7.  In pertinent part, section 2122.7 now provides the following:

4

> While a tax may fall under a category that is generally accepted as an allowable Medicare cost, the provider may only treat the net tax expense as the reasonable cost actually incurred for Medicare payment purposes.  The net tax expense is the tax paid by the provider, reduced by payments the provider received that are associated with the assessed tax.

Manual § 2122.7.

## 2.      The Medicaid Program

"Medicaid, established under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., is a 'cooperative federal-state program that provides federal funding for state medical services to the poor.'"  NB ex rel. Peacock v. District of Columbia, 794 F.3d 31, 35 (D.C. Cir. 2015) (quoting Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 433 (2004)).  "The federal government shares the costs of Medicaid with States that elect to participate in the program and, in return, participating States are to comply with the requirements imposed by the Medicaid Act and by the Secretary."  Banner Health v. Sebelius, 715 F. Supp. 2d 142, 147 (D.D.C. 2010) (citing Atkins v. Rivera, 477 U.S. 154, 156–57 (1986)).  "To qualify for federal assistance, a State must submit to the Secretary and have approved a 'plan for medical assistance,' [42 U.S.C.] § 1396a(a), that contains a comprehensive statement describing the nature and scope of the State's Medicaid program."  Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990) (citing 42 C.F.R. § 430.10 (1989)); see also Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d 291, 297 (3d Cir. 2013) ("States must submit their proposed plans to CMS, and CMS must review each plan, 'make a determination as to whether it conforms to the requirements for approval,' 42 U.S.C. § 1316(a)(1), and 'approve any plan which fulfills the conditions specified' in the Medicaid Act, 42 U.S.C. § 1396a(b).").

"In addition to the Secretary's authority to approve state Medicaid plans under Title XIX, the Secretary is given authority under [section] 1115 of Title XI [of] the Social Security Act, 42

U.S.C. § 1315, to 'waive compliance with any of the requirements' of 42 U.S.C. § 1396a to

enable States to carry out 'experimental, pilot, or demonstration project[s.]'" <u>Banner Health</u>, 715

F. Supp. 2d at 148 (citing 42 U.S.C. § 1315(a); <u>Portland Adventist Med. Ctr. v. Thompson</u>, 399

F.3d 1091, 1093 (9th Cir. 2005)).  "The requirements are waived to 'enable the states to try new

or different approaches to the efficient and cost-effective delivery of health care services, or to

adapt their programs to the special needs of particular areas or groups of recipients.'"  <u>Id.</u>

(quoting <u>Cookeville Reg'l Med. Ctr. v. Leavitt</u>, 531 F.3d 844, 845 (D.C. Cir. 2008)).  "Patients

who receive federally reimbursable care under a [section] 1115 waiver who would not otherwise

meet the normal Medicaid requirements are referred to as the 'expansion waiver population.'"

<u>Id.</u> (quoting <u>Leavitt</u>, 531 F.3d at 845).  "However, '[d]espite not meeting the requirements of

[Title] XIX, the costs of providing care under a demonstration project waiver are treated as

federally reimbursable expenditures made under [Title] XIX 'to the extent and for the period

prescribed by the Secretary.'"  <u>Id.</u> (alteration in original) (quoting <u>Leavitt</u>, 531 F.3d at 845).

   "In the late 1980s and early 1990s, states began to take advantage of a 'loophole' in the

Medicaid program that allowed states to gain extra federal matching funds without spending

more state money."  <u>Protestant Mem'l Med. Ctr., Inc. v. Maram</u>, 471 F.3d 724, 726 (7th Cir.

2006).  "States desiring to avail themselves of this statutory loophole would make payments to

hospitals and collect the federal matching funds."  <u>Id.</u>  "The state would then recoup a portion of

the state funding from the hospital, often in the form of a 'tax.'"  <u>Id.</u> (citation omitted).

"Congress addressed this problem in the Medicaid Voluntary Contribution and Provider–Specific

Tax Amendments of 1991, Pub. L. No. 102–234, 105 Stat. 1793 (1991) (codified at 42 U.S.C. §

1396b(w))."  <u>Id.</u>  "Through this legislation, Congress instructed the Secretary to reduce federal

matching funds to a state by the amount of any revenue received from a health care related tax

that 'hold[s] harmless' [,i.e., reimburses,] the health care provider upon whom the tax falls."  Id.

(quoting 42 U.S.C. § 1396b(w)(1)(A)(iii)).  "States still may fund their share of Medicaid

expenses by assessing taxes on health care related items, services or providers, as long as the tax

is uniform, i.e., 'broad-based,' and the tax contains no 'hold harmless provision.'"  Id. (quoting

42 U.S.C. § 1396b(w)(1)(A)(ii)(iii) & (4)).

### B.    The Massachusetts Uncompensated Care Trust Fund/Health Safety Net Trust Fund

The Massachusetts Uncompensated Care Trust Fund/Health Safety Net Trust Fund (the

"Trust Fund") "pays for medically necessary services provided by acute care hospitals . . . to

eligible low-income uninsured and underinsured individuals."  AR 000935–36.  At all relevant

times, the Trust Fund was funded by "(1) general state appropriations (2) a 'surcharge' on all

non-governmental purchasers of hospital and ambulatory surgical center services[, and] (3) [a]

[t]ax on acute care hospitals [(the "Hospital Tax")],"  Pl.'s Mem. at 10 (citing AR 000025,

001084), and administered by the Massachusetts Division of Health Care Finance and Policy

("the Division"), AR 000024–25.  The Hospital Tax was based on "acute care hospitals['] . . .

proportion of private-sector charges in relation to all Massachusetts acute care hospitals' private-

sector charges . . . ."  AR 000024.  "Massachusetts law required the Division to make payments

from the funds it collected from the [Hospital Tax] . . . for otherwise uncompensated care [the

hospitals] provided to certain qualifying under or uninsured low-income patients."  AR 000025.

The plaintiff asserts, and the Secretary does not contest, that the Hospital Tax was "mandatory."

Pl.'s Mem. at 11 (citations omitted); see also AR 000029 ("[A]ll acute care hospitals in

Massachusetts are required to pay the [Hospital Tax].").  Funds generated from the Hospital Tax

were used solely to fund the Trust Fund and not for any other purpose.  See AR 000028.

**C.     The Hospital Tax and Trust Fund Payments At Issue**

Massachusetts managed its Hospital Tax collection and Trust Fund payment as follows:

"During the fiscal year, providers made monthly interim payments of their [Hospital T]ax

liability as estimated by the Division."  AR 000024.  Likewise, providers were "paid a pre-

determined amount from the [Trust Fund] each month based in part on historical uncompensated

care."[2]  AR at 000936.  "The Division produced statements on a monthly basis [that] set

forth the providers' [t]ax liability," AR 000024, and that itemized the providers' Trust Fund

payments, see generally AR at 001341–1417.  "Each provider deposits the 'net' amount due to

the [Trust Fund] into its designated bank account based on this notice."  AR 000029.  Then,

"[t]he State deposits the uncompensated care payment due to each provider into its designated

bank account."  Id.  Then, "[t]he State sweeps [i.e., withdraws from] the designated bank

account . . . each provider's tax liability to the [Trust Fund]."[3]  Id.

"Because the Massachusetts statutory formula for determining the amount of each

provider's [Hospital T]ax liability depended upon each hospital's share of total private-sector

charges for all acute care hospitals in Massachusetts during that fiscal year, a change to any

hospital's private-sector charges would affect each hospital's own [Hospital T]ax liability."  AR

---

[2]  The Court hereinafter refers to the payments for uncompensated care made from the Trust Fund as "Trust Fund payments" or "Medicaid reimbursements."

[3]  To illustrate, if for a given month a provider owed $20 in Hospital Tax and was due $5 in Trust Fund payments, the state's regulations required the provider to deposit $15 into a designated account ($20 Hospital Tax - $5 Trust Fund payment).  AR 000029; see also AR 000505 (114 Mass. Code Regs. § 11.07(4) (2004) ("The Division will calculate and process monthly Hospital payments.  The Division will calculate each Hospital's gross assessment liability to the [Trust Fund] and the [Trust Fund's] liability to the Hospital and make payments to the Hospital on a net basis.")).  Thereafter, Massachusetts would deposit $5 into the account, which would at that point hold $20.  See AR 000059 ("Days later, the Division would pay into the account the full amount of the provider's reimbursement.  At that point, the account would necessarily contain the full amount of the provider's Tax liability.  Days after that, the Division would collect from the account the full amount of the Tax liability.").  Massachusetts would then withdraw from the account the full $20, resulting in a gain by the state of $15—an amount equal to the provider's Hospital Tax liability less the amount Massachusetts owed in Trust Fund payments—even though Massachusetts would collect $20 from the account.  See AR 000029.

000024.  "Accordingly, the Division calculated a 'final settlement' of all providers' [t]ax liability for a given year once the data on private charges for that year was collected."  Id.  For fiscal years 2004–2008 ("FY04–08"), after these settlements, the plaintiff paid the following Hospital Tax amounts: FY04—$3,777,105; FY05—$4,024,846; FY06—$4,941,109; FY07—$5,245,830; and FY08—$5,418,349.  Id.  For the same fiscal years, the plaintiff received Trust Fund payments in the following amounts: FY04—$1,714,683; FY05—$1,967,728; FY06—$1,664,912; FY07—$2,479,708; and FY08—$1,174,335.  AR at 000025.

**D.     Proceedings Before the Agency**

For fiscal years 2004–2005, the intermediary initially "allowed [the plaintiff's] gross claimed [Hospital T]ax expense as an allowable cost, without offsetting the reimbursements [that the plaintiff] received from the [Trust Fund] against the claimed [Hospital T]ax expense."  Pl.'s Mem. at 15; see also Def.'s Mem. at 11 ("CMS initially accepted [the] [p]laintiff's claim to entitlement of the full amount of the tax expenses it claimed . . . .").  "Subsequently, in July 2010[,] the intermediary reopened its review of FY04 and FY05 and issued audit adjustment reports offsetting [the plaintiff's] [Trust Fund] reimbursements against the [Hospital T]ax expense."  Pl.'s Mem. at 16; see also Def.'s Mem. at 11 ("[A]n auditor subsequently adjusted the allowable taxes, concluding that [the plaintiff] could only claim the net taxes it paid into the [Trust Fund] . . . .").  For fiscal years 2006–2008, "by notices dated July 2010, November 2010 and December 2010, the intermediary did not allow [the plaintiff] to claim its gross [t]ax expense as an allowable cost, and offset [the plaintiff's Trust Fund] reimbursements against the [t]ax expense."  Pl.'s Mem. at 16 (citations omitted).

The plaintiff "timely filed appeals with the Board challenging the intermediary's decision to offset [the plaintiff's Trust Fund] reimbursements against [the plaintiff's] [t]ax payments" for

fiscal years 2004–2008.  Id. at 17 (citing AR 000023).  "The Board held an evidentiary hearing

on June 12, 2013,"  id.; see also AR 0001063 (Transcript of Proceedings, June 12, 2013

("Hearing Tr.")), during which the plaintiff offered "extensive witnesses testimony," Def.'s

Mem. at 12.  "Following post-trial briefing, the Board issued its [d]ecision on May 28, 2014," id.

(citations omitted); see also AR at 000017–31, holding that "the payments made to the [plaintiff]

from the [Trust Fund] were properly treated as refunds of the [Hospital] Tax and properly offset

against the allowable [t]ax expense in the cost reporting periods in which the [Hospital] Tax was

incurred," AR at 000028.  On June 11, 2014, the plaintiff requested that CMS's "Administrator

review and reverse the [Board's] . . . decision."  AR at 000003 (emphasis omitted).  On July 21,

2014, the Administrator "declined to review the [Board's] decision."  AR at 000001.

"Accordingly, the Board's decision now constitutes the Secretary's final decision."  Pl.'s Mem.

at 19 (citations omitted); see also 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877(b)(2).

## II.  STANDARD OF REVIEW

In a case involving review of final administrative action, the summary judgment standard

of review set forth in Federal Rule of Civil Procedure 56 does not apply.  E.g., Se. Conference v.

Vilsack, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).  Rather, a court must "decid[e], as a matter of

law, whether an agency action is supported by the administrative record and consistent with

the . . . [arbitrary and capricious] standard of review [under the APA]."  Loma Linda Univ. Med.

Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted); see also Richards v.

INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).  In making this determination, a "district . . .

[court] sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law."

Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citations omitted).

"[A]rbitrary and capricious" review is "highly deferential" and "presumes the agency's

action to be valid."  Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981).  "The

scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Rather, "[c]ourt[s] consider[ ] whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors."  Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989)).

### III.   ANALYSIS

The parties do not dispute whether the Hospital Tax constitutes an "allowable cost" eligible for reimbursement under the Medicare Act.  AR 000028 ("the [p]arties agree that the [Hospital] Tax assessment is an allowable tax under the Medicare program").  Rather, where they depart is on the question of whether the Secretary's decision to offset the Trust Fund payments from the gross amount of the plaintiff's Hospital Tax, for the purpose of determining the amount of the plaintiff's Medicare reimbursement, was arbitrary, capricious, contrary to law, or unsupported by substantial evidence.  See Pl.'s Mot. at 1–2; Def.s' Mem. at 2.

"[U]nder the Medicare Act, participating health care providers are reimbursed for the 'reasonable cost' of providing services to Medicare beneficiaries."  Abraham Lincoln Mem'l Hosp. v. Sebelius, 698 F.3d 536, 541 (7th Cir. 2012) (quoting 42 U.S.C. § 1395f(b)(1)).  The Medicare Act defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs . . . ."  42 U.S.C. § 1395x(v)(1)(A) (emphasis added).  "This statutory definition, which explicitly requires [CMS] to reimburse

providers for the costs they actually incur reflects the Medicare program's statutory policy of paying only for a provider's net costs." Abraham Lincoln, 698 F.3d at 542 (citations and internal quotation marks omitted). However, the term "actually incurred" in 42 U.S.C. § 1395x(v)(1)(A) is ambiguous. See Abraham Lincoln, 698 F.3d at 552 n.7 (internal quotation marks omitted) (stating that the word "incurred" is an "ambiguous statutory term"). Thus, the Court looks to the Medicare Act's implementing regulations for guidance. 42 U.S.C. § 1395x(v)(1)(A) ("The reasonable cost of any services shall be . . . determined in accordance with regulations . . . ."); see Cmty. Hosp. of Monterey Peninsula v. Thompson, 323 F.3d 782, 799 (9th Cir. 2003) (noting that the Medicare Act's implementing regulations have "the force of law").

42 C.F.R. § 413.9(a) provides, in relevant part, that "[a]ll payments to providers of services must be based on the reasonable cost of services covered under Medicare . . . . Reasonable costs includes all necessary and proper costs incurred in furnishing the services . . . ." The regulations further state that "[d]iscounts and allowances received on purchases of goods or services are reductions of the costs to which they relate. Similarly, refunds of previous expense payments are reductions of the related expense." Id. § 413.98(a) (emphasis added). And, "refunds" are defined as "amounts paid back or a credit allowed on account of an overcollection." Id. § 413.98(b)(3) (emphasis added). Thus, by substituting "amounts paid back" for the term "refund" in § 413.98(a), the regulations require that "[amounts paid back] of previous expense payments are reductions of the related expense."

The position advanced by the Secretary is that the Trust Fund payments to the plaintiff constitute refunds "of the related expense," purportedly, the Hospital Tax. Def.'s Mem. at 17–24. The plaintiff asserts that the Hospital Tax and Trust Fund payments are unrelated and

therefore the Hospital Tax expense should not be offset by the amount of the Trust Fund

payments.  As discussed below, the Court agrees with the plaintiff's contentions.

###### A.   Whether the Trust Fund Payments Are Properly Characterized as a "Refund"

###### 1.   The <u>Abraham Lincoln</u> Opinion

In determining that the Medicaid payments were properly offset from the plaintiff's

Hospital Tax expense, the Board reasoned, relying on the United States Court of Appeals for the

Seventh Circuit's opinion in <u>Abraham Lincoln</u>, that the Medicaid payments and the tax were

"inextricably linked," and that one should consider the "net economic impact" in determining

whether the Trust Fund payments were a "refund" of the Hospital Tax.  <u>See</u> AR at 000028–30.

The Board based this decision on the following factual findings: (1) the Trust Fund was "set up

solely to pay for uncompensated care and the [t]ax [was] used solely for the [Trust Fund]," AR at

28; (2) "all acute care hospitals in Massachusetts [were] required to pay the [tax]," <u>id.</u> at 29; and

(3) "the uncompensated care payments [were] made to partially compensate [the] provider for

the underlying care (as opposed to guaranteeing the provider compensation of their full cost in

providing the uncompensated care)," <u>id.</u>  Further, the Board reasoned that the "methodology

utilized by the State to collect the [t]ax support[ed] the interrelated and dependent nature

between the [t]ax liability and the uncompensated care payments," insofar as the Division

administered the tax and the payments from the same account in a systematic fashion.  <u>See id.</u>

While the Court is mindful that substantial deference is owed to the Secretary in regards to her

reimbursement determinations, <u>see</u> <u>Thomas Jefferson</u>, 512 U.S. at 512, upon review of the record

in the case, the Court is nevertheless persuaded that the Secretary's determination to offset from

the Hospital Tax reimbursement the amount of the Trust Fund payments violates the APA.

Although the Board stated that the <u>Abraham Lincoln</u> opinion "provide[d] a comprehensive analysis of the interpretation and application of the controlling statutory and regulatory provisions at issue[, i.e.,] 42 U.S.C. § 1395x(v)(1)(A) and 42 C.F.R. § 413.9 respectively," AR 000030, the Court finds <u>Abraham Lincoln</u>'s reasoning unpersuasive.  A summary of the key facts and holding in <u>Abraham Lincoln</u> is useful at this juncture.  To fund its Medicaid program, <u>see</u> <u>Protestant Memorial</u>, 471 F.3d at 727, the State of Illinois imposed a tax on certain hospitals, <u>Abraham Lincoln</u>, 698 F.3d at 544.  For fiscal year 2004, the "[a]ccess [p]ayments[, i.e., the state's Medicaid payments to the hospitals,] were to be made on or before June 15, 2004, and the [t]ax [a]ssessment was due three days later on June 18, 2004,"  698 F.3d at 536.  Similarly, for fiscal year 2005, the access payments and tax assessments were due in four installments, with the access payments being paid by the state to the hospitals <u>first</u>, followed by the state's collection of the hospitals' tax assessment.  <u>See</u> <u>id.</u>  The Seventh Circuit concluded that "the [a]ccess payments clearly served to reduce related expenses, i.e., the [t]ax [a]ssessments, and therefore were appropriately offset . . . ."  <u>Id.</u>

Based on "a plain reading of the [Illinois] legislation," the Seventh Circuit concluded that the "[a]ccess [p]ayments clearly served to reduce related expenses, i.e., the [t]ax [a]ssessments" and were therefore properly offset, <u>Abraham Lincoln</u> at 549, but this conclusion focuses on the notion that the two payments were "related," <u>see</u> <u>id.</u>, and entirely ignores the temporal requirement in the "refund" regulation that a refund serves to reduce a provider's "<u>previous</u> expense payment," <u>see</u> 42 C.F.R. § 413.98(a) (emphasis added).  As outlined earlier, <u>see</u> <u>supra</u> at 13, the "refund" regulation, 42 C.F.R. § 413.98, states that "refunds of previous expense payments are reductions of the related expense."  42 C.F.R. § 413.98(a).  The regulations define "refunds" as "<u>amounts paid back</u> or a credit allowed on account of an overcollection."  <u>Id.</u>

14

§ 413.98(b)(3) (emphasis added).  Thus, a plain reading of these two provisions together reveals

that "[amounts paid back] of previous expense payments are reductions of the related expense."

See 42 C.F.R. §§ 413.98(a)–(b).  Thus, for a payment to constitute a "refund," the regulation sets

forth both a temporal and substantive relationship: the amount paid back must be for a "previous

expense payment" to reduce the "related expense."  See id.  In Illinois, the hospitals paid the tax

after they received access payments from the state, and while the access payments and tax

assessments may have been "related" to some degree, see Abraham Lincoln, 698 F.3d at 549,

they do not appear to this Court to qualify as a "refund" under 42 C.F.R. § 413.98(a).  This flaw

in the Abraham Lincoln court's reasoning is a sufficient reason for the Court to conclude that the

Board's reliance on that case was erroneous, and the Court will not rely on it here.[4]

> ### 2.   Evidence in the Record Regarding the Relationship Between the Hospital Tax and Trust Fund Payments

The Court's review of the record reveals that there was substantial evidence showing that

the Trust Fund payments at issue served to reduce the plaintiff's and other hospitals' costs of

providing care to under- and uninsured patients, and not to reduce the expense of the Hospital

---

[4] The defendant also relies on the Eighth Circuit Court of Appeals' opinion in Kindred Hospitals East, LLC v. Sebelius, 694 F.3d 924 (8th Cir. 2012), as support for her conclusion that the Hospital Tax and the Trust Fund payments are "inextricably linked," and therefore only the "net" tax expense is a reimbursable cost under the Medicare Act.  See Def.'s Mem. at 13.  But the only similarity between that case and this one is that both involved pooled funds.  See Kindred Hospitals, 694 F.3d at 926.  The facts in Kindred Hospital involved a pool established privately by a group of hospitals, for the purpose of defraying the inequitable impact of Missouri's Medicaid hospital tax program on certain hospitals.  Id. ("Because the tax [was] imposed on all hospitals regardless of the type of patients each hospital treat[ed], hospitals who treat[ed] a large number of Medicaid patients receive[d] more federal reimbursement, while other hospitals are effectively punished by the [Missouri Medicaid hospital tax] system for not having enough Medicaid patients.  This inequality led the hospitals in Missouri to initiate a pooling program . . . .").  According to the hospitals' agreement, Medicaid reimbursements were deposited into the pool, then redistributed to the hospitals based upon a formula that took into account "each provider's percent of contribution to the aggregate pool . . . ."  Id.  The Eighth Circuit concluded "[b]ecause there was a true reduction in Kindred's costs incurred because of the pool, the payments it received from the pool looked like refunds, acted like refunds, and were appropriately treated as such regardless of the label."  Id. at 928.  As set forth herein, infra at 16–17, the facts here are patently distinguishable: the plaintiff is not a member of a privately-established pool, and Trust Fund payments to hospitals like the plaintiff are based on the care provided to low-income and under- and uninsured patients, and were not in proportion to the amount of the plaintiff's contribution into the Fund.

Tax.  First, the Trust Fund payments were intended to reimburse Massachusetts hospitals' costs of providing care to under- or uninsured patients.  AR 000566 (Mass. Gen. Laws Ann. ch. 118G, § 18 ("There is hereby established a . . . Trust Fund, which shall be administered by the [D]ivision. . . .  The purpose of said fund is to reimburse hospitals and community health centers for care provided to low-income, uninsured, and underinsured residents of [Massachusetts].")) The record contains evidence showing that the Division determined the amount of each hospital's monthly Trust Fund payment using a formula based on an estimate of the hospital's actual costs of providing "uncompensated care" i.e., care provided to low-income, under- and uninsured patients.  See AR 000499 (114 Mass. Code Regs. § 11.07(1) (2004) (setting forth how the Division calculated each hospital's Trust Fund payment based on prior "reported uncompensated care charges")).

Further, and most significantly, the record contains evidence that the Secretary's interpretation of the "refund" regulation did not account for hospitals that received more in Trust Fund payments than they paid in Hospital Taxes.  The specific example considered by the Board during the administrative hearing in this case was the Boston Medical Center, another Massachusetts provider.  AR 001135.  In one year, Boston Medical Center paid $3.9 million in Hospital Tax, and Massachusetts owed it $63 million in Trust Fund payments.  Id.  It defies logic to suggest that the $63 million Trust Fund payment to Boston Medical Center constituted a "refund" of a "previous expense," 42 C.F.R. § 413.98(a), when that hospital's tax liability was only a small fraction of that amount.  The more logical conclusion is that the $63 million Trust Fund payment served the purpose of reducing Boston Medical Center's cost of providing care to under- and uninsured patients.  Indeed, the attorney for the Secretary's fiscal intermediary admitted during the Board's evidentiary hearing that the "refund" regulation did not account for

the Boston Medical Center scenario, stating that "the [refund] regulation is not designed for the specific [example,] but this is as close as we can get in here. . . .  Now to tell you the truth, the other $59 million, I'm not sure that that regulation covers that."  AR 001136 (Hearing Tr. at 294:5–19).  And, one of the hearing officers remarked that for "<u>most</u> of the[] other [hospitals] . . . it's illogical because their refund was greater than what they paid in," <u>id.</u> (Hearing Tr. at 293:15–19) (emphasis added).   Moreover, the Boston Medical Center example plainly demonstrates that it "actually incurred" the $3.9 million Hospital Tax it was required to pay, in addition to the separate cost of providing uncompensated care, as the two line items were expenses that arose in the same year. AR 001135.  And Massachusetts disbursed only the difference (approximately $59 million) to Boston Medical Center.  <u>Id</u>.  Thus, Boston Medical Center actually paid the $3.9 million in taxes, a payment that was reflected in the contemporaneous deduction of that amount from its Medicaid reimbursement for the separate cost of providing care to under- and uninsured patients.

The dilemma illustrated by the Boston Medical Center example was not addressed in the Board's analysis of the issues presented for its determination.  <u>See generally</u> AR 000028–31. The Secretary's reliance on the "refund" regulation for the decision to deny reimbursement of the "gross amount" of the Hospital Tax, despite this glaring inconsistency in the Rule's application to hospitals whose Medicaid reimbursement exceeded their Hospital Tax liability—an inconsistency that was recognized during the administrative hearing in this case—presents precisely the type of arbitrary and capricious agency action prohibited under the APA, <u>see</u> <u>New Evangelistic Center, Inc. v. Sebelius</u>, 672 F. Supp. 2d 61, 74 (D.D.C. 2009) ("An agency errs when it ignores contradictory relevant evidence regarding a critical factor in its decision." (citing

Morall v. Drug Enforcement Admin., 412 F.3d 165, 178 (D.C. Cir. 2005))), and the Secretary's decision must therefore be set aside.

### 3. The Manual "Clarification" and Whether the Hospital Tax Was "Actually Incurred"

The Board cited the Manual's December 2011 "clarification" of the circumstances in which taxes are "actually incurred" for purposes of reimbursement under the Medicare Act.  AR 000022.  As noted previously, in December 2011, the Manual was modified by the Department to include the following language:

> While a tax may fall under a category that is generally accepted as an allowable Medicare cost, the provider may only treat the net tax expense as the reasonable cost actually incurred for Medicare payment purposes.  The net tax expense is the tax paid by the provider, reduced by payments the provider received that are associated with the assessed tax.

Manual § 2222.7.  In adopting this change, the Department opined that, with respect to some state Medicaid programs, "subsequent disbursements to providers are associated with the assessed taxes and may, in fact, offset some, if not all, of the taxes originally paid by the hospitals."  75 Fed. Reg. at 50363 (emphasis added).  But as the Court has discussed above, supra at 16–17, the record contains substantial evidence to show that the Trust Fund payments here served to reimburse the plaintiff's and other hospitals' costs of providing uncompensated care and not to reduce the burden of the Hospital Tax.  Given this evidence, the Court concludes that, even assuming that the Manual "clarification" properly sets forth a reasonable interpretation of the term "actually incurred" with respect to taxes, the Trust Fund payments were not "associated with" the Hospital Tax beyond the mere existence of a pool into which hospitals deposited funds and from which Massachusetts disbursed funds, and the Secretary therefore erred in applying the Manual's language to the circumstances presented in this case.

### 4.     The "Hold Harmless" Requirement

The plaintiff argues that characterizing the Medicaid payments as a "refund" of the Hospital Tax would effectively and impermissibly hold it harmless from a portion of the Hospital Tax, in contravention of the Medicaid program's requirements.  Pl.'s Mem. at 30–32.  For purposes of authorizing federal matching funds for state Medicaid programs, the Medicaid Act requires state taxes imposed for the purpose of raising funds for that state's Medicaid plan to meet several requirements, including the "hold harmless" requirement.  See Protestant Memorial, 471 F.3d at 726 (through 42 U.S.C. § 1396b(w), "Congress instructed the Secretary to reduce federal matching funds to a state by the amount of any revenue received from a health care related tax that 'hold[s] harmless' the health care provider upon whom the tax falls." (citing 42 U.S.C. § 1396b(w)(1)(A)(iii))).  And under the Department's regulations:

> [a] taxpayer will be considered to be held harmless under a tax program if . . .[t]he State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount.

42 C.F.R. § 433.68(f)(3).

The plaintiff contends that if the Trust Fund payments are characterized as a "refund" of the tax, then effectively, hospitals such as the plaintiff are "held harmless," i.e., not required to pay "all or any portion of the tax amount," id., by virtue of the fact that they would only be required to pay the "net" tax amount (the gross amount of their tax liability reduced by the Trust Fund payment received from Massachusetts), Pl.'s Mem. at 31.  The Secretary's response to this argument is that "it is undisputed that [the p]laintiff was not 'held harmless' from the tax within the meaning of the relevant Medicaid regulations," but that this fact "does not answer the

question of whether it experienced a reduction in the effective cost of the tax." [5]  Def.'s Mem. at

26.  The Secretary's argument is seemingly an effort to deflect, rather than actually address, the

implications of the "hold harmless" requirement in this case.  The Court is inclined to agree that

the Secretary's characterization of the Trust Fund payments as "refunds" of the Hospital Tax

appears to be in tension with the "hold harmless" provision of the Medicaid Act and the

Department's implementing regulations, a statutory provision Massachusetts was required to

comply with in establishing its Medicaid plan and seeking federal matching funds.  See

Protestant Memorial, 471 F.3d at 726 (describing the "hold harmless" requirement).  The Court

reserves judgment on this question, however, because although this argument was presented to

the Board, AR 000027, the Board's decision does not analyze the interaction between the "hold

harmless" provision and the characterization of the Trust Fund payments as "refunds," see AR

000028–31.  The Court believes that the most prudent course is to allow the Secretary, on

remand, to provide analysis of the implications of the Medicaid Act's "hold harmless" provision

on this case.  See Fox v. Clinton, 684 F.3d 67, 80 (D.C. Cir. 2012) ("[T]here may be sensitive

issues lurking that are beyond the ken of the court. The [agency], not the court, has the authority,

discretion, and presumed expertise to act in the first instance to address matters within its domain

of authority under the [applicable statutes], subject of course to appropriate judicial review."). [6]

---

[5] The Court notes that this concession, i.e., that it is "undisputed" that the plaintiff was not "held harmless" from the Hospital Tax, tends to undermine the defendant's insistence that the plaintiff did not actually incur the gross amount of its Hospital Tax liability.

[6] The plaintiff further argues that the defendant's interpretation of the "refund" regulation effectively results in impermissible cost-shifting between the Medicare and Medicaid schemes. Pl.'s Mem. at 27–28.  Similar to the question presented by the "hold harmless" requirement, the Court also deems this "cost-shifting" concern to be a non-frivolous argument that, it appears, was presented to but not analyzed by the Board.  See AR 000084–85 (the plaintiff's post-hearing brief setting forth its arguments to the Board); AR 000028–31 (the Board's findings of fact and conclusions of law making no mention of this argument).  The Court will leave the question for the defendant to address in the first instance, as she possesses the requisite expertise in this field.

**B.      Whether the Board's Interpretation Represents a New Substantive Rule Issued Without Notice and Comment**

The plaintiff also asserts that the Board's interpretation of the "actually incurred" provision of the Medicare statute and the "refund" regulation represents a new substantive rule that should have been promulgated through notice and comment procedures.  See Compl. ¶¶ 94–99; Pl.'s Mem. at 42–44.  The Court need not reach this issue, however, because it has already found that the Board's decision was arbitrary and capricious and not supported by substantial evidence, requiring that the decision be vacated.  Therefore, this portion of the plaintiff's motion for summary judgment will be denied without prejudice.

## IV.      CONCLUSION

Having found that the Secretary's final decision to deny the plaintiff reimbursement of its gross Hospital Tax liability during the fiscal years at issue was arbitrary and capricious and contrary to the evidence, the Court vacates the Board's decision and remands this case to the agency for further agency proceedings consistent with this Memorandum Opinion.

**SO ORDERED** this 24th day of October, 2016.[7]

REGGIE B. WALTON
United States District Judge

---

[7] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.